DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment of the Huron County Court of Common Pleas that accepted jury verdicts finding Ronald Danny Renfro ("Danny") guilty of two counts of aggravated arson and sentenced him to serve eight years in prison. Because we find that the verdicts of the jury were not against the manifest weight of the evidence, we affirm the judgment of the Huron County Court of Common Pleas.
Danny has presented only one assignment of error for consideration on appeal. The sole assignment of error reads:
 "The verdict of the jury convicting Defendant of Counts 1 and 2 was against the manifest weight of the evidence of record."
The Supreme Court of Ohio has explained the role of an appellate court considering a manifest weight challenge on appeal as follows:
 "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' Blacks supra, at 1594.
 "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. * * *" State v. Thompkins (1997), 78 Ohio St.3d 380, 387.
The Supreme Court of Ohio has also said the jury at trial, not an appellate court, has the function of deciding which witnesses are credible. With these standards in mind, we have carefully reviewed the record and the arguments of the parties on appeal.
The record shows that the counts for which Danny was convicted, Counts One and Two in a three count indictment, contained allegations that Danny violated R.C. 2909.02(A)(1), and R.C. 2909.02(A)(2), aggravated arson. The jury found Danny not guilty of the allegation in the third count, that he tampered with evidence, a violation of R.C. 2921.12(A)(1).
The statutory provisions Danny was convicted of violating provide:
 "(A) No person, by means of fire or explosion, shall knowingly do any of the following:
 "(1) Create a substantial risk of serious physical harm to any person other than the offender;
 "(2) Cause physical harm to any occupied structure. . . ." R.C. 2909.02(A)(1),(2).
These were the elements the state had the burden of proving beyond a reasonable doubt.
Danny argues on appeal that the state failed to meet its burden of proof on either count. He alleges that the state never rebutted the alibi testimony he presented at trial, which he says shows that he could not have started the fire which resulted in the charges filed against him because he had left town before the fires were started. He says the state used confusion to make the jury believe his wife's testimony that it took them eleven hours or a little longer to make a trip to her father's house in Illinois unbelievable.
The testimony presented by the state showed the following pertinent evidence. Danny and his wife owned a building in downtown Greenwich, Ohio. They had two businesses in the building: a book store and a bar. They also had their personal living quarters in the building. On either side of the building were a bank and a hair salon. The buildings were close together, separated by no more than a foot of space.
At 4:00 a.m. on February 23, 1999, people living in the vicinity of Danny's building discovered a fire in his building when they smelled smoke after awakening to care for a baby. The neighbors telephoned in an alarm and then awoke a woman who lived in an apartment above the hair salon by pounding on her apartment door. The woman was able to safely leave her apartment, but the area was filled with smoke from the fire that was blazing in Danny's building at that time.
The witnesses who were present when the fire was first discovered and who first arrived in response to the alarm all testified that they could see fire coming from the windows on the second floor of Danny's building. At least two witnesses who were close to the building testified that they could not see any fire on the first floor of the building. The two witnesses were a woman who had worked as a bartender for Danny and who had a set of keys to the building and her husband, who was a volunteer firefighter. They testified that they did not know Danny and his wife were not in the building when the fire was burning. They tried to use the keys in their possession to open the front and back door of the building, but could not get the keys to work. They testified that they were able to look in a window on the back door and that they did not see any fire on the first floor.
The fire chief testified that there he had been told of rumors in the community before the fire happened that Danny planned to set his building on fire. In addition, when he arrived at the scene of the fire, he was approached by an officer from the police division who said that he had seen Danny in the back of the building around 3:30 a.m. The chief decided to call the state fire marshall to ask that the fire be investigated as suspicious. He testified that a great deal of damage was caused to the building by the fire.
An investigator from the state fire marshall's office did arrive to investigate the fire. In addition, an investigator hired by the insurance company that issued a fire insurance policy to Danny on the building and its contents also conducted a later investigation of the fire. Both investigators testified that in their opinion the fire was started when someone deliberately poured a liquid accelerant in the building and then set fire to the accelerant. A dog trained to smell and alert to residue from an accelerant at the scene of a fire alerted to six different locations on the first floor. All six samples taken by the state fire marshall and analyzed at a laboratory tested negative for accelerant. However, one sample taken by the insurance investigator and analyzed at a laboratory tested positive for accelerant.
Two witnesses testified that Danny told them, in separate incidents before the fire, that he should just "torch" the building and get out of town. One witness was a teen-age boy who helped do odd jobs at the bar. The other witness was the bartender who was in charge at the time the fire happened. Both witnesses also testified that Danny discussed financial problems with them and said that his business was failing.
Two other witnesses testified that they saw Danny carrying items to or from his car near the bar building just before the fire. One witness was the village police officer who had approached the fire chief. The police officer testified that while he was on patrol during the early morning hours, he saw Danny in the alley behind the bar between 3:35 and 3:50 a.m. He said there was a passenger in Danny's car, a green Ford Taurus. He said he saw Danny take an item that looked like a box from the back seat of the car and then walk into the back door of the bar. The officer then left the area to continue patrol.
The second witness testified that he was a regular patron of the bar. He said he was out just driving through town that morning, and he saw Danny in front of the bar between 3:45 and 4:00 a.m. He said that Danny was loading a few things into a green Ford Taurus that belonged to Danny.
The state argued that Danny had at least two motives for burning down his building. First, he was under investigation for a sexual offense. The state called several witnesses who confirmed that Danny was under investigation, that tensions were high in the community as a result of the allegations against Danny, and that business had dropped off at the bar after the allegations became known in the community. In addition, witnesses testified that two of Danny's vehicles, parked near the bar, had been vandalized after the investigation became public knowledge.
Second, the state called several witnesses who were creditors of Danny. Their testimony showed that Danny had a history of passing bad checks to many of his creditors, including wholesale suppliers of beer, wine and liquor, the gas company, the telephone company, a vending machine company, and the local grocery store. Several of the creditors said they switched to a "cash only" basis for doing business with Danny. Some of the creditors testified that Danny still owed them money at the time of the fire, including the gas company, which had issued a shut-off notice, the bank where Danny was behind on a car loan, and the phone company. The beer, wine and liquor distributors testified that their sales to Danny's business had dropped dramatically from the time he first became a customer until the time the fire happened.
The state also presented testimony from the insurance agents who sold Danny his insurance policies. Their testimony showed that Danny kept fire insurance on his building, his personal possessions, and his three vehicles. The fire insurance on the building at the time of the fire was $120,000 and $20,000 on the contents. In addition, Danny and his wife had fire insurance on their personal possessions amounting to $140,000.
Testimony showed that Danny and his wife had let it be known during the week before the fire that they would be going to the Decatur, Illinois area to be with her father while he had surgery. When the fire took place, the female former bartender who was close friends with Danny and his wife placed a telephone call from the police station in Greenwich to Danny to let him know about the fire. She testified that he seemed shocked when he heard the news.
An official from the bank that was located next to Danny's building contacted Danny in Illinois and arranged to buy Danny's building. The banker testified that he paid Danny $20,000, the amount of an outstanding mortgage on the building held by Danny's mother. The banker said he drove from Greenwich, Ohio to Decatur, Illinois to hold a closing for the sale of the building. He testified that it took him twenty hours and five minutes to make the round trip.
The volunteer firefighter who was married to the female bartender who was a good friend of Danny testified that he was in the bar the night before the fire. Danny asked him to move one of Danny's vehicles to property owned by the firefighter. The firefighter agreed, and moved the vehicle that night. He testified that the vehicle was full of stored personal items.
The bartender who was running the bar the night before the fire happened testified that in the afternoon before the fire he helped Danny's wife load several personal items into vehicles owned by Danny and his wife. He said he noticed personal papers among the items he was loading, like a birth certificate or a marriage license.
The police chief for the village of Greenwich testified. He itemized several personal belongings that were seized by the police. Among those items were personal pictures and birth certificates. He said that the investigation conducted by the department included searches of the items stored in the vehicles owned by Danny and his wife, of Danny's mother's home, and of a storage unit where Danny and his wife had stored several belongings after selling their house and moving into the building where the bar was located.
A witness who was in jail during some of the time that Danny was being held in jail before trial testified. He said that he overheard Danny confessing to a visitor that he should not have done what he did, that he would be in prison for a long time and telling the visitor that the visitor would have to take care of Danny's mother. The witness admitted that he had several felony convictions. He also said he could not see to whom Danny was talking when he overheard the conversation.
In his defense, Danny called several witnesses. One witness, a part-time police officer for the village of Greenwich, testified that he advised Danny to get out of town for a while the summer before the fire took place, because "feelings were high" against Danny due to the allegation and investigation of a sex offense.
The volunteer firefighter who was married to the female former bartender testified as a defense witness as well as a state witness. He confirmed that Danny had seemed ill the night before the fire. He also verified that two of Danny's vehicles had been vandalized in the months preceding the fire. He testified that because Danny and his wife had hired several different workmen to help with renovations to the building, several people had keys to the building. In addition, he testified that he had on occasion gotten into the building without using a key.
Finally, Danny's wife testified. She said that while their financial situation just before the fire was difficult, they were not without hope that business would improve. She said they sold their home and moved into the building temporarily because Danny was suffering poor health and was finding it difficult to make late night/early morning drives from the bar to their house. She said they were in the process of looking for an apartment to move into and that she had begun moving their belongings from the building that burned in anticipation of moving elsewhere. She said she did not want to store their belongings on vacant floors in their building because the unoccupied floors were too dusty.
She said that she and Danny left for Decatur, Illinois at 1:30 a.m. on the morning of the fire. She said she was driving, because Danny was ill. She said that when she reached Columbus, Ohio, she became confused about the route to follow, and ended up taking the wrong route. She said the unplanned detour took a half hour to forty-five minutes of their time before they returned to the correct route. She also said that she was not a good night-time driver, so she pulled the car off the road and took a thirty minute nap before continuing on to her father's house. She and her father both testified that she and Danny arrived at her father's house at lunchtime.
She and her father testified that Danny was very ill when he arrived at her father's house. Indeed, he became so ill, they eventually took him for treatment at an emergency room. She testified that when they got a telephone call from Ohio telling them the bar had burned, both she and Danny were shocked.
She testified that after spending a few days with her father following his surgery, they drove to Danny's mother's house in Ohio. Danny became so ill with phlebitis, he was hospitalized in Cleveland, Ohio. While he was in the hospital, the police arrested him for arson.
After carefully considering all of the above information, we cannot conclude that the jury lost its way when it decided that the state proved beyond a reasonable doubt that Danny committed arson that caused a substantial risk of physical harm to his neighbor and committed arson that caused harm to an occupied structure. While we acknowledge that the testimony of Danny's wife, if believed, could have created reasonable doubt in the minds of the jury, the jury was charged with the job of deciding credibility of witnesses. The jury clearly found the testimony of the state's witnesses which placed Danny in the vicinity of the bar shortly before the fire was discovered more credible than the testimony of Danny's wife that she and Danny left town well before the fire started. The guilty verdicts were therefore not against the manifest weight of the evidence, and the sole assignment of error in this case is not well-taken.
The judgment of the Huron County Court of Common Pleas is affirmed. Danny is ordered to pay the court costs of this appeal.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Peter M. Handwork, J., Melvin L. Resnick, J., and James R. Sherck, J., CONCUR.